[Civ. No. 29341.   Second Dist., Div. Four.   June 24, 1965.]

GEORGE A. FULLER COMPANY, Plaintiff and Respondent, v. ORVILLE RAINEY et al., Defendants and Appellants.

[Civ. No. 29216.   Second Dist., Div. Four.   June 24, 1965.]

ORVILLE RAINEY et al., Plaintiffs and Appellants, v. COUNTY OF LOS ANGELES et al., Defendants and Respondents.

(Consolidated Cases.)

Phill Silver for Defendants and Appellants in case No. 29341 and for Plaintiffs and Appellants in case No. 29216.

Fulop, Rolston & Burns and Lowell R. Marks for Plaintiff and Respondent in case No. 29341.

Harold W. Kennedy, County Counsel, and Walter R. Burkley, Jr., Deputy County Counsel, for Defendants and Respondents in case No. 29216.

KINGSLEY, J.—These two cases both involve the validity of proceedings taken by the Board of Supervisors of the County of Los Angeles, looking toward the construction of a water system in the Topanga-East Malibu areas of Los Angeles County by a Special Improvement District and the validity of a contract awarded by the county for such work. Case No. 29216 is an action by certain property owners in the proposed district, on behalf of themselves and other protesting property owners, for a determination that the proceedings involved were void and for an injunction against proposed special assessments. Case No. 29341 is a statutory action, brought by the successful contractor, pursuant to sections 860-870 of the Code of Civil Procedure, and sections 5266-5274 of the

Streets and Highways Code, to determine the validity of the said proceedings and of the contract awarded to it pursuant to those proceedings.

The issues in the two cases are the same; the two actions were tried together, resulted in findings in favor of validity and in judgments against the plaintiffs in case No. 29216 and in favor of the plaintiff in case No. 29341. The cases have been submitted here on a single set of briefs, and we deal with both appeals in this one opinion. For convenience, we refer to the defendants in case No. 29341 and the plaintiffs in case No. 29216 as "property owners," and to the plaintiff in case No. 29341 as the "contractor."

The basic facts are not in dispute, since the case was tried on the record of the proceedings taken by the board of supervisors, other public records, and stipulations as to testimony.

In May 1961, 48 residents of the area in question, acting under section 55109 of the Water Code, petitioned the board of supervisors to instruct the county engineer to prepare a report (commonly known as a feasibility report) recommending a means of providing water service for that area. Instead of proceeding to take the steps set out in the Water Code for the formation of a county waterworks district, the board began to take the steps set out in the Streets and Highways Code looking to the creation of a special assessment district under what is commonly known as the 1911 Act (now Sts. & Hy. Code, §§ 5100 et seq.) The board, acting under section 5130,[1] directed the county engineer to prepare a feasibility report. On April 24, 1962, such a report was submitted, indicating, as the "careful estimate of the costs and expenses of such work" (see § 5130), a figure of $2,225,000. The report was approved and filed by the board on May 8, 1962. On June 6, 1962, a resolution of intention to institute proceedings under the 1911 Act was adopted, as required by section 5131. On August 28, 1962, a resolution and notice of hearing, as required by section 5132, was duly adopted, the hearing date being fixed for October 18, 1962, and this resolution and notice were published as required by section 5133. Notices of the adoption of the resolution, and of the date of hearing, were thereafter mailed to property owners in the district, as required by sections 5194 and 5195. Protests were filed, pursuant to section 5220, by 472 property owners within the

---

[1]Section references hereafter are to the Streets and Highways Code unless otherwise indicated.

proposed district.[2] Hearings on the protests so filed were held and, after conclusion of the hearings, the board overruled the protests and ordered the work to be done. (§ 5221.)

On November 12, 1963, the board, acting under section 5231, adopted a resolution of intention to modify the work theretofore ordered—the modification involving an increase in cost of $175,000. The required notices were given, a second hearing was held, and the modification was adopted on December 5, 1963. (§§ 5231-5233.) In April and May 1964, similar modification proceedings, pursuant to sections 5231-5233, were taken, resulting in changes in the work to be done but not (so far as appears from the record) increasing the estimated cost beyond the previously established figure of $2,400,000. Bids were duly called for but the only bid received was in the amount of $3,499,400, and it was rejected by the board, since it exceeded the county engineer's estimate by more than 10 per cent.

The board then directed the county engineer to make a fresh estimate of costs. The engineer reported that his revised estimate was in the amount of $3,840,000.[3] The board then directed its clerk to send notices by mail, giving the revised estimate, pointing out that this would involve an increase in the contemplated assessment by about 60 per cent, and seeking a poll by post card as to the desire of the property owners to proceed. Notices were sent to the owners of 12,452 acres;[4] cards were returned from the owners of 6,017 acres, of which 3,426 acres were in favor of proceeding and 2,591 acres were in favor of abandonment. The board "assumed" that the owners who did not respond were in favor of proceeding. The board then, on September 1, 1964, by a four-fifths vote, adopted an "addendum" which incorporated the revised cost estimate and also made some minor changes in the details of the work.[5] Bids were again requested, and the contractors

---

[2]This was less than the majority protest which, under section 5222, required postponement unless overruled by a four-fifths vote.

[3]The increase in the estimate is stated to have resulted in part from increases in costs generally in the two-year period which had intervened after the original estimate was made and in part from errors made in arriving at and computing the original estimate.

[4]The total acreage involved is 13,608; the owners of 1,156 acres were not notified, either because their addresses were unknown or because the letters sent to them were returned as nondeliverable. It is apparently assumed that the remaining notices were, in fact, received by their addressees.

[5]The undisputed evidence is that these changes did not cause any increase in the cost of the work and that they did not affect its basic character.

submitted the lowest bid, in the amount of $2,965,000. The board, on September 29, 1964, awarded a contract on this basis and the statutory notice of award (§ 5248) was first published on October 8, 1964.

The complaint in the property owners' action (case No. 29216) was filed on September 28, 1964, and was served on September 29, 1964. A formal letter of protest was served on October 27, 1964. The contractor's statutory validation proceeding was commenced on October 30, 1964.

I

Except for a claim that the hearings held by the board of supervisors in the fall of 1963 were unfair, in that the board had prejudged the matter and had unduly restricted the property owners in presenting their objections, no complaint is made of any of the proceedings until after the rejection of the first bid.

For reasons set out hereinafter in this opinion, we conclude that this objection was not available to the property owners. However, even if it were properly urged in these proceedings, it is a contention without merit on these appeals. The issue of the fairness of the hearings was submitted to the trial court; that court found that the hearings ''were conducted fairly and in accordance with all constitutional rights of the protestants.'' We have read the record of the hearings; it supports the finding of the trial court; that finding, being supported by the evidence, is binding here.

II

However, we conclude that neither the objection to the conduct of the 1963 hearing, nor the question of the validity of the post card poll, nor the contention that a fourth formal hearing, on notice, was required in order to accept the revised cost estimate and call for bids based thereon, are properly raised in these proceedings.

Whatever may be the constitutional requirement for a hearing where it is proposed to create an improvement district to perform public works financed by an ad valorem tax on the real property within the proposed district, it is now well settled that, in proceedings such as those before us, where the costs are to be assessed on a basis of the benefit of the work to the property involved, there is no constitutional right to any hearing until such time as proceedings to determine the individual assessments have begun. (*Brill* v. *City of*

*Los Angeles* (1930) 209 Cal. 705, 708 [289 P. 850]; *Capital Freight Lines* v. *City of Sacramento* (1962) 206 Cal.App.2d 279 [23 Cal.Rptr. 752]; *Londoner* v. *Denver* (1908) 210 U.S. 373, 378-379 [28 S.Ct. 708, 52 L.Ed. 1103].) ▮ But, under the 1911 Act, those proceedings, and the property owners' hearing on the assessment, are not commenced until after the work has been completed and the exact cost has been ascertained. (§§ 5340 et seq.)

▮ The provisions in the act setting out the procedures to be followed prior to and including the award of a contract are purely statutory. They may loosely be called ''jurisdictional,'' in that, unless waived or unless an omission or other noncompliance is cured by a curative or validating act, they must be followed in order to result in the establishment of a valid district. However, since these procedures are purely statutory, and are not constitutionally required, the Legislature which set them up may also provide that compliance with any of them may be waived in a manner provided by law. (*Chase* v. *Trout* (1905) 146 Cal. 350 [80 P. 81].)

The statute herein involved contains such a waiver provision; sections 5258 and 5259 provide:

''§ 5258. At any time within ten days from the date of the first publication of the notice of award of the contract, any owner of, or other persons having any interest in, any lot or land liable to assessment, who claims that any of the previous acts or proceedings relating to the work are irregular, defective, erroneous or faulty, may file with the clerk a written notice specifying in what respect the said acts and proceedings are irregular, defective, erroneous or faulty. The notice shall state that it is made pursuant to this section.''

''§ 5259. All objections to any act or proceeding occurring prior to the time within which such objections are permitted to be filed in relation to the work, not made in writing and in the manner and at the time specified, shall be waived, if the resolution of intention to do the work has been actually published, as provided in this division.''

▮ It is clear that the letter of protest filed with the board on October 27, 1964, was ineffective, since it came nine days after the period allowed by statute. But the property owners contend that the filing and service of their complaint in case No. 29216 satisfied the requirements of a notice under section 5258. ▮ The contractor, the county and the board of supervisors contend that the service of the complaint was not sufficient, both because it was premature (since it ante-

dated by nine days the first publication of the notice of award) and because the complaint did not, as required by the final sentence of section 5258, state that it was a notice "made pursuant to" section 5258.

While we would not be prepared to hold ineffective a notice, otherwise sufficient in form, merely because it had been filed before the date set out in the section, still we think that the premature filing here, of a notice not in the statutory form, was not such a compliance with section 5258 as to preserve any right to object to mere statutory irregularities. The inclusion, by a separate sentence, of the requirement that the notice of irregularity state expressly that it was made pursuant to the code section must be deemed to have had some definite purpose. That purpose is not hard to find. The clerk of a board of supervisors receives, each working day, a mass of communications—claims, summons and complaints in litigation of all sorts, petitions, protests, notices and other documents. He should not be required to read each one with care, and to determine for himself its legal nature. A notice under section 5258 would, in the ordinary course of public business, be routed to one department of county government, and to one set of officials, for analysis and report to the board; a summons and complaint in a civil action would be routed to other officials, for a different treatment. To require a property owner who seeks to halt proceedings such as these to make his intent clear and express, is not only not unreasonable, but it is a requirement designed to make more efficient the conduct of public business and more effective the very protest itself. The Legislature having imposed this requirement as a condition of preservation of the right to object to irregular procedures, would-be objectors, and the courts, must follow and enforce the provision.

Since the property owners' complaint did not purport to be a notice under section 5258, it was not such a notice; and, no notice under section 5258 having been given, section 5259 applies and the property owners are now barred from raising the issues herein relied on.

The judgments are affirmed.

Files, P. J., and Jefferson, J., concurred.

A petition for a rehearing was denied July 13, 1965, and appellants' petition for a hearing by the Supreme Court was denied August 18, 1965.